FILED
CLERK

8/31/2015 4:47 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RICHARD HENNINGSEN,

                Plaintiff,

   -against-

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                Defendant.
-------------------------------------------------------------X
FEUERSTEIN, J.

**AMENDED ORDER**
13-CV-4392 (SJF)

      Richard Henningsen ("plaintiff" or "claimant" or "Henningsen") commenced this action

pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of defendant

Commissioner of Social Security Administration ("Commissioner" or "defendant") denying his

November 29, 2010 application for disability benefits. Now before the Court is defendant's

motion for remand for further administrative proceedings [Docket Entry No. 15] and plaintiff's

cross-motion for judgment on the pleadings and remand solely for calculation of benefits.

[Docket Entry No. 17]. For the reasons that follow, defendant's motion is DENIED and

plaintiff's motion is GRANTED, and this case is remanded solely for calculation of benefits.

I.     BACKGROUND

     A.     Administrative Proceedings

      On November 29, 2010, plaintiff, a chiropractor, filed an application for disability

insurance benefits alleging disability beginning January 31, 2000 due to cervical, thoracic and

lumbar disease following a November 4, 1997 car accident. [Docket Entry No. 21 Transcript of

Administrative Record ("Tr.")), 37, 107-10, 123]. On March 2, 2011, the Social Security

Administration ("SSA") denied plaintiff's application. *Id.* at 65-68. Pursuant to plaintiff's

request for a hearing (*id*. at 104-05), a hearing was held on November 1, 2011 before Administrative Law Judge Seymour Rayner (the "ALJ"), at which plaintiff appeared with his attorney. *Id*. at 32-61. On January 11, 2012, the ALJ issued a decision (the "ALJ Decision") finding that plaintiff was not disabled from January 31, 2000, the alleged onset date, through December 31, 2002, the last date he was insured.[1] *Id*. at 19-31.

The ALJ found that: (1) the claimant last met the insured status requirements of the Social Security Act on December 31, 2002; (2) the claimant did not engage in substantial gainful activity during the period from his alleged onset date through his last insured date; (3) the claimant had the following severe impairments: herniated cervical and lumbar disc disease with radiculopathy which limited his ability to stand, walk, lift and carry; (4) the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526); (5) the claimant had the residual functional capacity to perform the full range of sedentary work; (6) the claimant was unable to perform any past relevant work; (7) the claimant was forty-two (42) years old on the last insured date; (8) the claimant had at least a high school education and was able to communicate in English; (9) applying the Medical-Vocational Rules directly supported a finding of "not disabled" whether or not the claimant had transferable job skills; (10) there were jobs that existed in significant numbers in the national economy that the claimant could have performed; (11) the claimant was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date through the last insured date. *Id*. at

---

[1]     To qualify for SSD benefits, Plaintiff must be disabled and insured for disability benefits. 42 U.S.C. § 423(a)(1)(A) and (C); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2002, and alleges a disability as of January 31, 2000. Therefore, the period of review is from January 31, 2000, his alleged onset date, to December 31, 2002, his date last insured.

24-27. On July 2, 2013, the Appeals Council denied plaintiff's request for review (*id*. at 1-6), rendering the ALJ Decision the final decision of the Commissioner.

B.     Non-Medical Evidence

Plaintiff was born in 1960. Tr. 120. He graduated from college and obtained a graduate degrees as a chiropractor. *Id*. at 35, 124. Plaintiff worked full-time as a chiropractor from January 1986 (*id*. at 36, 124) until his car accident on November 4, 1997, when he began working part-time until January 2000, when he stopped working altogether due to his back pain. *Id*. at 36, 130.

Plaintiff's disability report (Form SSA-3368) identifies his impairments as cervical, thoracic and lumbar disease since a car accident in 1997. *Id*. at 123. Plaintiff reported receiving chiropractic treatment from 1997 to 2000 from Joseph Mills, D.C. (*id*. at 127), seeing Steven Pinsky, M.D. for his low back pain in 1999 (*id*.) and receiving epidural steroid injections at Mercy Medical Center in 1999. *Id*. at 126. Roman Urbanczyck, M.D. was plaintiff's primary care doctor for over ten (10) years. *Id*. at 128. Plaintiff reported that he underwent L5-S1 lumbar discectomy in February 2000, but continued to have lumbar, cervical and thoracic pain. *Id*. at 129-30. Plaintiff had been treated by Lauren Stimler-Levy, M.D. since 2003. *Id*. at 128. He was taking Fiorcet, prescribed by Dr. Urbanczyck for headaches, Oxycodone, prescribed by Dr. Stimler-Levy for pain, and Tylenol for pain. *Id*. at 126. Plaintiff reported: that it was painful for him to sit, stand or walk for prolonged periods of time and sometimes he could stand and walk for ten (10) to twenty (20) minutes unmedicated and sometimes forty-five (45) minutes on pain medication but then had to recline for thirty (30) to sixty (60) minutes; that he could not repeat being on his feet up to forty-five (45) minutes but could walk for ten (10) to twenty (20) minutes a few times per day; that he was in bed three (3) to four (4) times per day; that after forty-five

(45) to sixty (60) minutes of sitting, his back often knotted up requiring him to get up to move around or recline, and that he had difficulty concentrating because of pain. *Id*. at 130.

A disability report dated March 16, 2011 (Form SSA-3441) noted that Dr. Stimler-Levy prescribed plaintiff Flexeril for muscle spasms and Oxycodone, which caused drowsiness, for pain. *Id*. at 135, 143. Plaintiff also stated he was taking Tylenol (pm) for pain and sleep and that he had to lie down three (3) to four (4) times a day because of back pain and muscle spasm, and could not do anything repetitive because of back pain. *Id*.

Plaintiff testified that he had continued to work after a November 1997 car accident and had tried to rehabilitate himself with physical therapy, electro-needle injections, and spinal taps. *Id.* at 38. He stopped working on or about January 31, 2000 and had a lumbar discectomy at L5-S1 on February 14, 2000 which relieved a shooting pain that had radiated into his groin since the accident, but his "24/7" low back pain, numbness in his right leg and "a list of other things" continued and worsened over the intervening eleven (11) years. *Id.* at 38-41. Following the surgery, he received physical therapy and chiropractic treatment, and saw Doctors Zelefsy and Stimler-Levy, who prescribed physical therapy, pain medication, and administered trigger point injections. *Id*. at 40-41. The medication and injections took the "edge" off his back pain. *Id.* at 54. Plaintiff testified as to his limited abilities to sit, bend, stand and walk. *Id*. at 42-43, 55-59. He occasionally used a cane to walk and wore a back brace. *Id*. at 48-49, 54. Plaintiff estimated that he could lift forty (40) or fifty (50) pounds, but not repetitively. *Id*. at 55. He could go up and down stairs twice a day. *Id*. at 51, 56. Plaintiff stated that all of these limitations had existed since 2000. *Id*. at 43. Plaintiff testified that he had driven to the hearing. *Id*. at 48. He could take care of his personal hygiene and grooming. *Id*. He did not do laundry, sweep, mop, vacuum, take out the garbage, or make the bed. *Id*. at 49-51. He occasionally cooked and

washed dishes, and did light shopping every day at a shop around the corner from his house. *Id.* at 50, 57. He watched television but rarely went to the movies or restaurants because it was uncomfortable to sit for longer than thirty (30) to thirty-five (35) minutes. *Id.* at 53, 56.

  C. Medical Evidence

    1. Medical Evidence Prior to Onset Date

  On November 5, 1997, plaintiff's car was rear-ended while stopped on the parkway. *See* Tr. 191-94. He was seen by Eric Roth, M.D., of Valley Physical Medicine and Rehabilitation ("Valley PT") on November 5, 1997, January 28, 1998, and May 6, 1998, and referred for physical therapy. *Id.* at 193-96, 342, 345-47, 350-62, 364. In March, April and July of 1998, Dr. Roth concluded that plaintiff had been "totally disabled and unable to perform regular work from 1/14/98 through present." *Id.* at 350, 364-65. Plaintiff received physical therapy at Valley PT from November 6, 1997 through January 26, 2000. *Id.* at 197-236. Plaintiff was also seen by Pavani Tipirneni, M.D., and Emil Stracar, M.D., of Valley PT in connection with his physical therapy there from 1998 through January 2000. *Id.* at 316, 329, 331-41, 343-44, 363, 365-68. A cervical sonogram performed on November 8, 1997 was normal. *Id.* at 308. An EMG study on December 9, 1997 showed denervation potentials in the left C5-6 innervated muscles that were compatible with left C5-6 radiculopathy. *Id.* at 272. Spinal range of motion testing performed on December 26, 1997 revealed a "whole person impairment" of ten (10) percent. *Id.* at 309-10. A cervical spine MRI performed on January 3, 1998, revealed central disc herniations at C4-5 and C5-6. *Id.* at 267-68. A lumbar spine MRI performed on January 12, 1998 showed right paracentral disc herniation at L-5/S-1 with impingement upon the right S-1 nerve root and an annular disc bulge at T-12/L-1. *Id.* at 269. A lumbar spine sonogram conducted on March 1, 1998 revealed muscular edema. *Id.* at 313. Plaintiff, who had been diagnosed with lumbar disc

disorder with myelopathy, was administered an epidural steroid injection at Mercy Medical Center on August 11, 1999. *Id.* at 149-59, 684-88. Injections were also administered on September 8, 1999 (*id.* at 160-70) and October 13, 1999. *Id*. at 171-81.

> 2. Medical Evidence From Onset Date to Date Last Insured

Plaintiff saw Dr. Tipirneni at Valley PT on February 9, 2000, complaining of pain and stiffness in his lower back with radiation pain into his right leg, and presenting with an antalgic gait. *Id.* at 317. He reported no numbness or tingling. *Id.* Upon physical examination, muscle strength and sensation were normal, there was no tenderness or spasm in the cervical paraspial muscles, or painful restriction in flexion, extension, bilateral lateral bending and bilateral rotation. *Id.* There was tenderness and spasms in the quadratus lumborum and the lumbar paraspinal muscles, painful restriction in all ranges of motion, and straight leg raising was positive on the right at forty-five (45) degrees. *Id.* Dr. Tipirneni diagnosed lumbar sprain, L-5/S-1 disc herniation, and lumbar radiculopathy, and authorized continued physical therapy. *Id*.

On February 14, 2000, neurosurgeon Jack Stern, M.D., Ph.D., performed a microlumbar discectomy and removed a discrete and substantial subligamentous disc herniation compressing the nerve root at L-5/S-1 on the right. *Id.* at 182-84. Plaintiff was discharged from the hospital on February 15, 2000 and reported that his leg pain was much improved. *Id*. at 187.

An August 25, 2000 letter from Dr. Stern describes his treatment of plaintiff (*id.* at 189-90), noting that he first saw plaintiff on December 8, 1999, over two years after a November 5, 1997 motor vehicle accident, and that plaintiff reported significant neck pain, predominantly on his right side, with numbness and tingling in his right arm, and low back pain radiating to his buttocks since the accident. *Id.* at 189. Conservative therapy, including traction, heat, cold, exercise, and stretching did not significantly help. *Id.* A January 1998 MRI of plaintiff's lumbar

spine showed severe degenerative disc disease at L5-S1 and a herniated disc at the L5-S1 level impinging on the right side (*id.*), EMGs confirmed his C-6 radiculopathy consistent with injury to the nerve roots (*id.*), and plaintiff's December 1999 lumbar MRI revealed a herniation of the disc at the L-5/S-1 level extending from the midline and compressing the L-5/S-1 nerve root. *Id.* at 190. Following the failure of "extensive conservative therapy" (*id.*), plaintiff decided to proceed with the microdiscectomy surgery on February 14, 2000, which significantly improved plaintiff's radicular pain. *Id.* Dr. Stern saw Plaintiff for the last time on April 18, 2000. *Id.*

From January to May 2000, plaintiff received physical therapy at Valley PT on fifty-six (56) occasions. *See id.* at 236-53.

At plaintiff's March 17, 2000 visit with Dr. Tipirneni at Valley PT, plaintiff presented with pain and stiffness in his lower back, minimal neck pain, headaches, intermittent pain of the right calf, and an antalgic gait. *Id.* at 318. Plaintiff reported mild improvement with physical therapy. *Id.* Physical examination revealed tenderness and spasms in the lumbar spine and painful restrictions in ranges of motion of the cervical and lumbar spines. *Id.* Straight leg raising was negative bilaterally, muscle strength and sensation in the arms and legs were within normal limits. *Id.* Dr. Tipirneni diagnosed lumbar radiculopathy, and status post ("S/P") micro discectomy of L-5/S-1, and authorized chiropractic treatment. *Id.* On April 17, 2000, Plaintiff complained to Dr. Tipirneni of lower back pain radiating into his right buttock and headaches, and presented with an antalgic gait. *Id.* at 319. Plaintiff noted moderate improvement from physical therapy. *Id.* Physical examination revealed normal muscle strength and sensation, no tenderness, spasms, or painful restrictions in the cervical paraspinal muscles, but tenderness, spasms, and painful restriction in ranges of motion in the lumbar spine. *Id.* Straight leg raising was negative bilaterally. *Id.* Dr. Tipirneni diagnosed S/P micro discectomy of L-5/S-1, and

authorized continued physical therapy. *Id.* Plaintiff visited Dr. Tipiernemi on June 2, 2000 complaining of pain and stiffness in the lower back which had been worsening over the prior three (3) weeks and headaches. *Id*. at 320. Dr. Tipirnemi stated that plaintiff's gait was antalgic, and he had tenderness and spasms and painful restrictions in ranges of motion in the lumbar spine but not in the cervical spine. *Id.* Straight leg raising was positive on the right at forty-five (45) degrees, and muscle strength and sensation were normal. *Id*. Dr. Tipirneni diagnosed lumbar subluxations, lumbar myofascitis, headaches, and S/P L-5/S-1 discectomy, and authorized continued physical therapy. *Id.* He opined that Plaintiff should perform only light, administrative duties with no physical exertion. *Id.*

At an August 28, 2000 visit to Dr. Tipirneni, plaintiff presented with an antalgic gait and complained of pain and stiffness in the lower back and the back of the right leg, headaches, and mild numbness and tingling. *Id*. at 321. Physical examination revealed tenderness, spasms and painful restrictions in ranges of motion in the lumbar spine. *Id.* Straight leg raising was positive on the right at forty-five (45) degrees, and muscle strength and sensation were normal. *Id*. Dr. Tipirneni diagnosed lumbar subluxations, lumbar myofascitis, lumbar radiculopathy, S/P L-5/S-1 discectomy, and headaches. *Id*. Dr. Tipirneni referred plaintiff to a pain clinic and authorized continued physical therapy. *Id.* at 322. At a visit to Dr. Tipirneni on November 6, 2000, plaintiff complained of stiffness and pain in the lower pain and radiation of pain to the right leg with bending, and noted that he had undergone nerve block. *Id*. at 370. Plaintiff reported moderate improvement with physical therapy. *Id*. Physical examination revealed tenderness, spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id*. Straight leg raising was negative bilaterally and motor strength and sensation were normal. *Id*. Dr. Tipirneni diagnosed sacroiliac sprain and post-surgical back pain, and recommended continued physical therapy. *Id*. Plaintiff

returned to Dr. Tipirneni on January 3, 2001, complaining of increased pain and stiffness in the lower back and headaches (2) two to (3) three times a week, and presented with an antalgic gait. *Id.* at 323. Physical examination revealed tenderness, spasms and painful restrictions in ranges of motion in the lumbar spine. *Id.* Straight leg raising was negative bilaterally and muscle strength and sensation were normal. *Id.* Dr. Tipirneni diagnosed S/P discectomy of L-5/S-1 and recommended continued physical therapy. *Id.*

In January, February and March of 2001, plaintiff underwent physical therapy at Valley PT on the following dates: January 8, 15, 22, and 31; February 7, 14, 19, and 26, and March 5, 14 and 20, 2001. *Id.* at 253-55. At a March 24, 2001 visit to Dr. Tipirneni, plaintiff complained of pain and stiffness in the lower back but no numbness or tingling and reported moderate improvement from physical therapy. *Id.* at 324. Physical examination revealed tenderness, spasm, and painful restrictions on ranges of motion in the lumbar spine. *Id.* Straight leg raising was negative bilaterally, and muscle strength and sensation were normal. *Id.* Dr. Tipirneni diagnosed lumbar myofascitis and S/P discectomy L-5/S-1. *Id.* Plaintiff had physical therapy on March 29, and April 4, 9, and 17, 2001. *Id.* 255-56. At an April 24, 2001 visit to Dr. Tipirneni, plaintiff presented with an antalgic gait and complained of pain and stiffness in the lower back, occasional radiation of pain into the buttocks, and headaches, no numbness or tingling, and noted mild improvement from physical therapy. *Id.* 325. Physical examination revealed tenderness, spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id.* Straight leg raising was negative bilaterally, and muscle strength and sensation were normal. *Id.* Dr. Tipirneni diagnosed lumbar subluxations, lumbar myofascitis, lumbar radiculopathy, and S/P discectomy L-5/S-1. *Id.* Plaintiff had physical therapy again on April 30, and May 8 and 15, 2001. *Id.* 256, 260. A May 15, 2002 letter from Dr. Tipirneni stated that plaintiff had "permanent partial

disability" and was unable to resume working as a chiropractor. *Id*. at 330. Plaintiff attended physical therapy on May 21 and 29, and June 4. *Id.* at 260. On June 13, 2011, he presented to Dr. Tipirneni with an antalgic gait and complained of pain and stiffness in the lower back, sharp pain on the right across his back for the prior two (2) days, weakness and giving out of the legs associated with the pain, but no numbness and tingling, and moderate improvement with physical therapy. *Id*. at 371. Physical examination revealed tendernesss, spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id*. Straight leg raising was negative bilaterally, and muscle strength and sensation were normal. *Id.* Dr. Tipirneni diagnosed S/P discectomy L-5/S-1 and rule out lumbar disc herniation, and ordered continued physical therapy and an MRI of the lumbar spine. *Id.*

Plaintiff attended physical therapy on June 15, 21, and 29, and July 6, 12, and 20, 2001. *Id*. at 260, 262. Plaintiff visited Dr. Tipirneni again on July 25, 2001, presenting with an antalgic gait and complaining of pain and stiffness in the lower back radiating into the right buttock and headaches, but no weakness, numbness or tingling, and moderate improvement with physical therapy. *Id*. at 326. Physical examination revealed tendernesss, spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id*. Straight leg raising was negative bilaterally, and muscle strength and sensation were normal. *Id.* Dr. Tipirneni diagnosed lumbar myofascitis, lumbar radiculopathy, S/P discectomy, and headaches. *Id*.

Plaintiff attended physical therapy sessions on the following dates: August 1, 9, 16, 22, and 30; September 12, 21, and 28; October 5, 10, and 19; November 1, 10, 16, and 21; and December 6 and 14, 2001. *Id*. at 261-64. At a December 17, 2001 visit to Dr. Tipirneni, plaintiff presented with an antalgic gait and complained of low back pain and stiffness, of cramping in his legs, numbness and tingling in his right left, and headaches, but denied any weakness and

admitted to moderate improvement with physical therapy. *Id.* at 327. Physical examination

revealed tenderness, spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id.*

Straight leg raising was positive at forty-five (45) degrees bilaterally. *Id.* Dr. Tipirneni

diagnosed S/P discectomy and headaches. *Id.* Plaintiff received physical therapy on December

19 and 27, 2001, and January 2 and 10, 2002. *Id.* at 264-66. On March 6, 2002, he presented to

Dr. Tipirneni with an antalgic gait and complained of pain and stiffness in the lower back with

radiation to the right buttock, numbness and tingling on the lateral aspect of the right thigh upon

lying down, but no weakness, and mild improvement with physical therapy. *Id.* at 315. Physical

examination revealed tenderness, spasms, and painful restrictions in ranges of motion in the

lumbar spine. *Id.* Straight leg raising was negative bilaterally and muscle strength and sensation

were normal in the upper and lower extremities. *Id.* Dr. Tipirneni diagnosed disc herniation in

the L-5/S-1 spine and right sciatica. *Id.* He authorized physical therapy once a week. *Id.* On

April 10, 2002, plaintiff presented with an antalgic gait and complained of pain and stiffness in

the lower back, right leg and thigh numbness and tingling, no weakness, and moderate

improvement with physical therapy. *Id.* at 369. Physical examination revealed tenderness,

spasms, and painful restrictions in ranges of motion in the lumbar spine. *Id.* Straight leg raising

was negative bilaterally and muscle strength and sensation were normal in the upper and lower

extremities. *Id.* Dr. Tipirneni diagnosed lumbar radiculopathy, lumbar myofascitis, and S/P

discectomy, and authorized continued physical therapy. *Id.*

Plaintiff first saw David Zelefsky, M.D., of Nassau County Pain Management,

Rehabilitation & Medical Offices, P.C., on July 23, 2002. *Id.* at 669-74. Plaintiff complained of

low back pain radiating to the right buttock, numbness in the right leg, and headaches, and noted

that physical activity aggravated the symptoms. *Id.* at 669. Plaintiff was taking Oxycodone for

severe symptoms. *Id*. at 670. He reported that he was unable/very restricted in his ability to lift or bend. *Id*. On examination, straight leg raising was negative. *Id*. at 671. Plaintiff's neck and back paraspinal muscles were tender. *Id*. at 670-71. Ranges of motion in the lumbar spine were: flexion to forty-five (45) degrees, extension to five (5) degrees and lateral flexion to ten (10) degrees. *Id*. at 671. Gait and sensation were normal. *Id*. at 672.

In December 2010, Dr. Zelefsky summarized his examination of plaintiff on July 23, 2002, noting that plaintiff had normal posture and ambulated without assistance on that day (*id.* at 699); that examination of the cervical spine had revealed deep and superficial muscle spasm and tenderness and muscle splinting of the anterior cervical musculature bilaterally as well as the posterior paravertebral musculature bilaterally, positive cervical distraction test, decreased range of motion with pain, diminished biceps, triceps, and brachioardialis tendon reflexes on both arms, and weakness of the right bicep and deltoid (*id.*); and that examination of the dorso-lumbar spine revealed tenderness and muscle spasm of paravertebral musculature bilaterally, positive straight leg raise tests, demonstrated radicular pain along the sciatic nerve distribution on the right, decreased range of motion with pain, diminished sensation of the right L-5 dermatome, diminished patellar and Achilles reflexes bilaterally, and weakness of the right quadriceps, right hamstring, and right extensor hallicus longus. *Id*. A lumbar MRI conducted in in September 2002 revealed S/P right hemi-laminectomy at L-5/S-1 level, surrounding the right S-1 nerve root and interposed between the nerve root in the thecal sac and in the right lateral recess, enhancing epidural scar present, and a disc protrusion to the left of the midline at L-5/S-1. *Id*. Dr. Zelefsky diagnosed: clinical signs of a cervical radiculopathy; C-4/C-5 and C-5/C-6 disc herniations; clinical signs of a lumbar radiculopathy; L-5/S-1 disc herniation compromising the right S-1 nerve root; S/P L-5/S-1 discectomy; epidural scar surrounding the right S-1 nerve root and in the

lateral recess/thecal sac; L-5/S-1 disc protrusion to the left of the midline; and myofascitis.  *Id.* at 700.

Dr. Zelefsky's opinion was that plaintiff suffered avulsive insult to the anterior longitudinal ligaments and accessory spinal ligaments with compression trauma to the intervertebral discs resulting in local hemorrhage, disc dehydration, and possible spondylosis, which narrowed the neurological openings and produced nerve root compression.  *Id.* at 700.  Dr. Zelefsky opined that this irritation caused the disc to take on a more wedge-shaped position, which was indicated on plaintiff's MRIs, and that eventually, abnormal weight bearing and uneven wear would cause a pressure atrophy so that the entire thickness of the involved disc would become diminished.  *Id.*  The articulating surfaces had been wrenched apart, and the ligaments and connective structure at their attachments were stretching and tearing, nerve root compression was causing radicular pain, and the subsequent pain caused muscles supporting the injured area to spasm and splint.  *Id.*  When injured connective tissue healed, scar tissue would replace it and this would cause a loss in the normal range of motion because scar tissue does not have elasticity.  *Id.*  Dr. Zelefsky noted that this was evident on the neurological and orthopedic testing.  *Id.*  The loss of range of motion would give rise to calcification in the form of arthritic deposits, which further limit motion.  *Id.* at 700-01.  Dr. Zelefsky opined that plaintiff had made sporadic improvement obtaining progressive general relief of symptoms, but was subject to episodes of remission and exacerbation.  *Id.* at 701.  He believed the exacerbations were caused by lifting, bending, riding, extensive walking, sitting for long periods of time, and repetitive movements.  *Id.*  Dr. Zelefsky stated that "[t]he positive neurological and orthopedic findings along with the positive MRI, the patient's symptomotology, and loss of range of motion point[ed] to a poor recovery" (*id.*) and that plaintiff could "anticipate future recurrence of the

pain in the cervical and lumbar regions from time to time, more especially prevalent at times of stress, fatigue, or emotional upset" and that "[l]ittle [could] be done to prevent this." *Id.* Dr. Zelefsky stated that plaintiff's prognosis was "poor at the present time" and that plaintiff had "shown little relief of his symptomatic state." *Id.* Dr. Zelefsky believed that plaintiff's condition was a direct result of the November 1997 accident which caused "permanent and consequential limitations." *Id.*

Dr. Stimler-Levy stated that she had treated plaintiff since July 23, 2002 for cervical, thoracic, and lumbar disc disease and that he had been unable to perform any continuous, substantial gainful activity since February 14, 2000. *Id.* at 694-96. Dr. Stimler-Levy opined that since that date, plaintiff had the following limitations: he could sit for one half-hour (1/2) at a time and up to four (4) hours total in an eight (8)-hour workday, could stand or walk for up to one half-hour (1/2) at a time and up to two (2) hours total in an eight (8)-hour work day, he needed to recline frequently throughout the day and avoid bending, squatting, reaching, climbing, stooping, kneeling, crawling, and balancing, he could occasionally lift up to ten (10) pounds, but could not use his hands or legs for sustained repetitive action during an eight (8) hour workday for such functions as fine manipulations, simple grasping/gripping, pushing pulling arm controls, repetitive reaching overhead. *Id.* at 695-96. According to Dr. Stimler-Levy, plaintiff's exertional capacity was for less than the full range of sedentary work. *Id.* at 697.

### 3. Medical Evidence After Date Last Insured

Plaintiff continued treatment at NY Rehab, visiting Dr. Zelefsky every month from January 2, 2003, through December 4, 2007 (*id.* at 374-674) and Dr. Stimler-Levy six (6) times from June 14, 2010, through at least April 15, 2011. *Id.* at 690-93, 710-13, 715-31. Dr. Stimler-

Levy administered trigger point injections to the left upper trapezius and levator scapulae muscles on January 26, 2011. *Id*. at 723. Plaintiff was also seen at NY Rehab multiple times from March through September 2011 and trigger point injections were administered on March 23, June 6, and July 5, 2011. *Id.* at 732.

A cervical spine MRI conducted on September 17, 2008 revealed straightening of the usual lordosis, a tiny posterior disc protrusion at C-3/C-4, a focal right parasagittal herniation with mild encroachment upon the cord at C-4/C-5, a central posterior herniation touching the cord margin at C-5/C-6, and a moderate sized posterior and left posteriolateral herniation with mild cord impingement and narrowing of the left lateral recess and the entrance to the left neural foramen at C-6/C-7. *Id*. at 372.

A lumbar MRI conducted on September 18, 2008 revealed a right posteriolateral disc herniation with narrowing of the right lateral recess and encroachment upon the right S-1 nerve root at L-5/S-1, and subtle disc bulging at L-3/L-4 and L-4/L-5. *Id*. at 373. Dr. Zelefsky performed nerve conduction studies (NCS), nerve conduction velocity (NCV) and EMG testing on December 4, 2008. *Id*. at 675-82. NCS/NCV findings were consistent with bilateral median neuropathy, sensori-motor on right side as seen in carpal tunnel syndrome, right tibial motor neuropathy, and right L-5/S-1 nerve root irritation, and EMG findings were consistent with right C-5 nerve root irritation. *Id*. at 678.

An MRI of the thoracic spine conducted on February 5, 2010 revealed left sided posterior disc herniation at T-6/T-7 and mild degenerative changes of the discs elsewhere in the thoracic spine. *Id*. at 689. Roman Urbanczyzk, M.D., plaintiff's primary care physician, completed a questionnaire dated February 19, 2011 (*id*. at 702-06) stating that he saw plaintiff every three (3) months, that plaintiff experienced numbness in his leg (*id*. at 704), and that his diagnoses were

chronic low back pain and hypercholesterol.  *Id.* at 702.  Dr. Urbanczyzk opined that plaintiff

could sit less than six (6) hours per work day and stand/walk less than two (2) hours per day and

his ability to lift and carry was limited. *Id*. at 705.

II.     DISCUSSION

      A.      Standards of Review

            1.      Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are

closed – but early enough not to delay trial – a party may move for judgment on the pleadings."

Fed. R. Civ. P. 12(c).  The standard applied to a Rule 12(c) motion is the same as that applied to

a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Bank*

*of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).  To survive such a motion, "a

complaint must contain sufficient factual matter…to state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal

quotation marks omitted).  The court must accept all well-pleaded factual allegations in the

complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Id.* at

679; *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is

limited "to facts stated on the face of the complaint, in documents appended to the complaint or

incorporated in the complaint by reference, and to matters of which judicial notice may be

taken."  *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

            2.      Review of Determinations by the Commissioner of Social Security

Upon review of the final decision of the Commissioner, a court may enter "judgment

affirming, modifying, or reversing the decision…with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  A district court must consider whether "there is substantial

evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r,* 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)). "[I]t is not the function of the reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law might have affected the disposition of the case." *Id.* at 189. If so, the Commissioner's decision must be reversed. *Id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same

conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

"Upon setting aside the Commissioner's decision, the court may either remand for a new hearing or remand for the limited purpose of calculating benefits." *Maline v. Astrue*, No. 08-civ-1712, 2010 WL 4258259, at *2 (E.D.N.Y. Oct. 21, 2010) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987). "Remand for the calculation of benefits is appropriate when the record provides persuasive proof of disability and the application of the correct legal standards 'could lead to only one conclusion.'" *Id.* However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court should remand "for further development of the evidence." *Rosa v. Callahan,* 168 F.3d 72, 82-83 (2d Cir. 1999). Where "further administrative proceedings would serve no purpose, remand for the calculation of benefits is warranted." *Sublette v. Astrue*, 856 F. Supp. 2d 614, 619 (W.D.N.Y. 2012).

B.      Evaluation of Disability Under the Social Security Act

Pursuant to 42 U.S.C. § 423(d)(1)(A), the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Pursuant to regulations promulgated under the Act, the Commissioner is required to apply a five (5) step sequential analysis to determine whether an individual is disabled under Title II of the Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the

next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's residual functional capacity ("RFC") before proceeding to the fourth and fifth steps of the sequential analysis. 20 C.F.R. §§ 404.1520(e); 404.1545(a)(5). The Commissioner's RFC assessment must be based on "all of the relevant medical and other evidence" in the case record, including "any statements about what [the claimant] can still do that have been provided by medical sources" and any "descriptions and observations of [the claimant's] limitations from [his or her] impairments, including limitations resulting from [his or her symptoms], such as pain, provided by [the claimant] or [other persons]." 20 C.F.R. § 404.1545(a)(3). In addition, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)" (20 C.F.R. § 404.1545(b)), and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting" (20

C.F.R. §404.1545(c)), may reduce a claimant's ability to do past or other work. 20 C.F.R. § 404.1545(e) provides that:

> [w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone…In assessing the total limiting effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence…

20 C.F.R. § 404.1545(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(a)(1)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(1)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(1)(v). If the claimant can make an adjustment to other work, the claimant is not disabled. *Id.* If the claimant cannot make an adjustment to other work, the claimant is disabled. *Id.* The claimant bears the burden of proving first four (4) steps of the

sequential analysis, while the Commissioner bears the burden at the last step.  *See Talavera*, 697

F.3d at 151.

      C.      Errors by the ALJ in the Application of the Five-Step Sequential Analysis

      Both plaintiff and defendant agree that remand is necessary, however they disagree as to

whether remand should be for further administrative proceedings or solely for calculation of

benefits.  Plaintiff argues that the case should be remanded solely for calculation of benefits

[Docket Entry No. 18 (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to

Remand for Further Administrative Proceedings and in Support of his Cross-Motion for a

Judgment on the Pleadings with Remand Solely for Calculation of Benefits ("Pl. Mem."))].  The

Commissioner argues that the case should be remanded for further administrative proceedings

because the ALJ committed legal error by: "mistakenly [finding] found that Dr. Tipirneni

provided the only treating source opinion pertaining the relevant period" when in fact Doctors

Stimler-Levy, Urbancyzk, and Zelefsky all treated plaintiff during this period and provided

opinions on his abilities and limitations [Docket Entry No. 16 (Memorandum of Law in Support

of Defendant's Motion for Remand ("Def. Mem.")), at 19] and "[o]n remand, the ALJ will be

given the opportunity to evaluate the treating source evidence that was overlooked" [Docket

Entry No. 19 (Reply Memorandum in Support of Defendant's Motion for Remand for Further

Administrative Proceedings and in Opposition to Plaintiff's Cross-Motion for Judgment on the

Pleadings ("Def. Reply")) at 3]; "fail[ing] to fully analyze Plaintiff's credibility" (Def. Mem. at

21); and "not adequately identify[ing] the evidence supporting his finding that Plaintiff had an

RFC for the full range of sedentary work during the relevant period." *Id*. at 4.

1.      Treating Physician Rule

Social Security Regulations provide that a treating physician's opinion on the nature and severity of a claimant's symptoms is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [claimant's] case record."  20 C.F.R. § 404.1527(c)(2).  The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."  *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  The rule "governs the weight to be accorded the medical opinion of the physician who treated the claimant...relative to other medical evidence before the fact-finder, including opinions of other physicians."  *Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir. 1986).  "The regulations also require the ALJ to set forth her reasons for the weight she assigns to the treating physician's opinion."  *Shaw*, 221 F.3d at 134.

However, "the opinion of the treating physician is not afforded controlling weight where...the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (internal citations omitted).  Where there is substantial evidence in the record that conflicts with the treating physician's opinion, the opinion will not be afforded controlling weight (*see Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)), and "the less consistent that opinion is with the record as a whole, the less weight it will be given."  *Snell v. Apfel*, 177 F.3d

128, 133 (2d Cir. 1999), 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [it] will [be] give[n]…"). "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve" (*Burgess v. Astrue*, 537 F.3d 117, 128 (2d. Cir. 2008) (quoting *Veino*, 312 F.3d at 588)), and the "ultimate finding of whether a claimant is disabled and cannot work" is "reserved to the Commissioner." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 287-88 (E.D.N.Y. 2008). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider the following factors to determine how much weight to give the opinion: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion. *Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c).

Plaintiff and defendant agree that "the ALJ mistakenly found that Dr. Tipirneni provided the only treating source opinion pertaining the relevant period" when in fact Dr. Stimler-Levy, Dr. Urbancyzk, and Dr. Zelefsky[2] all treated plaintiff during this period and provided opinions on his abilities and limitations. Def. Mem., at 19. The fact that some of these evaluations "were expressed after the end of [claimant's] insured period is of no moment" as the "diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment." *Parker v. Harris*, 626 F.2d 225, 232 (2d Cir. 1980) (citing *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974)). The opinions of these treating physicians as to plaintiff's disability and his ability to perform the full range of sedentary work were "binding in the absence of substantial evidence to the contrary even if the treating physician[s'] evaluations

---

[2]       As defendant notes, "the ALJ fails to mention Dr. Zelefsky at all." Def. Mem., at 19.

[were] made after the last date on which the claimant met the special earnings requirement." *Allan v. Sec. of HHS*, No. 87-civ-1322C, 1989 WL 280263, at *4-5 (W.D.N.Y. Sept. 15, 1989); *see also Pino v. Astrue*, No. 09-civ-3465, 2010 WL 5904110, at *20 (S.D.N.Y. Feb. 8, 2010), *report and recommendation adopted*, No. 09-civ-3465, 2011 WL 814721 (S.D.N.Y. Mar. 8, 2011) ("if uncontradicted and uncontested by other medical opinion or overwhelmingly compelling non-medical evidence, a treating physician's retrospective opinion should be given conclusive weight") (internal citations and quotations omitted). The ALJ's failure to properly apply the treating physician rule requires reversal. *Allan*, 1989 WL 280263, at *4-5 (reversing and remanding solely for calculation of benefits where "the Secretary ha[d] failed to establish that the decision of the ALJ [was] supported by substantial evidence" and where "the Secretary failed to apply the treating physician rule" and "the record [did] not contain substantial evidence contradicting the opinion of [the treating physician]…that plaintiff was disabled").

2.     Evaluation of Plaintiff's Credibility

As defendant concedes, the ALJ also committed legal error in evaluating plaintiff's credibility. In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account…but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). "Because it is the function of the agency, not reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of

witnesses, including the claimant, we will defer to its determinations as long as they are supported by substantial evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (summary order) (internal citations omitted). The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus*, 615 F.2d at 27). Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the ALJ "must then evaluate the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349-50 (E.D.N.Y. 2010) (citing § 404.1529(c)(2)-(3)).

In assessing a claimant's allegations concerning the severity of his symptoms, an ALJ must engage in a two-step analysis. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). Second, [i]f the claimant does suffer from such an impairment...the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* If plaintiff's testimony concerning the intensity,

persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. *See Meadors v. Astrue*, 370 Fed. Appx. 179, 183 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).   An ALJ who finds that a claimant is not credible must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Rivera v. Astrue*, No. 10-civ-4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012) (quoting *Taub v. Astrue,* No. 10-civ-2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

Here, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment."  Tr. at 25.  The ALJ committed legal error in his assessment of plaintiff's credibility because "[i]n a formulation that suggested a clear violation of [the] rule [requiring an ALJ to assess the credibility of a claimant's statements and only then go on to determine his RFC], the ALJ announced his RFC assessment and then wrote that [the Plaintiff's] statements were not credible to the extent they were inconsistent with that RFC assessment." *Box v. Colvin*,

No. 12-civ-1317, 2014 WL 997553, at *21 (E.D.N.Y. Mar. 14, 2014) (citing *Maldonado v. Commissioner of Social Sec.*, No. 12-civ-5297, 2014 WL 537564, at *17 (E.D.N.Y. Feb. 14, 2014) (citing *Otero v. Colvin*, No. 12-civ-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013))).  Courts in this district have repeatedly found remand to be appropriate based on an ALJ's use of this shorthand credibility determination because "assessing a plaintiff's credibility after making an RFC determination warrants remand, as the SSA "regulations provide that the ALJ must assess the claimant's credibility *before* evaluating the RFC."  *Adesina v. Astrue*, No. 12-civ-3184, 2014 WL 5380938, at *12 (E.D.N.Y. Oct. 22, 2014) (citing *Genier*, 606 F.3d at 49 (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3), and S.S.R. 96–7p)); *see also Yu v. Astrue*, 963 F. Supp. 2d 201, 217 (E.D.N.Y. 2013) (remanding where ALJ employed the same "to the extent...inconsistent" formulation used here); *Otero*, 2013 WL 1148769, at *7 (same); *Smollins v. Astrue*, 2011 WL 3857123, at *10 (E.D.N.Y. Sept. 1, 2011) (same).

In evaluating the plaintiff's credibility, the ALJ also failed to properly consider all the factors listed in 20 C.F.R. § 404.1529(c)(3) and explain how he balanced those factors.  *See Adesina*, 2014 WL 5380938, at *13 ("When conducting a credibility inquiry, the ALJ is required to consider all of the factors listed in 20 C.F.R. § 404.1529(c)(3) and explain how she balanced those factors.").  The ALJ "did not refer to Plaintiff's specific subjective complaints…did not discuss Plaintiff's medical treatment or his response to it with any specificity" including any possible side effects from Oxycodone, which plaintiff was taking during the period at issue, and mischaracterized the extent to which plaintiff was able to complete certain daily activities, such as climbing the stairs.  Def. Mem., at 21-22.  The ALJ's "failure to apply the proper legal standard in weighing Plaintiff's credibility is, alone, a basis for remand." *Adesina*, 2014 WL 5380938, at *12; *see also Grosse v. Comm'r of Soc. Sec.*, No. 08-civ-4137, 2011 WL 128565, at

*5 (E.D.N.Y. Jan. 14, 2011) (remanding where ALJ "committed legal error" because the ALJ "wholly failed to consider factors (2) through (7)" in its credibility analysis).

### 3. Evaluation of Plaintiff's RFC

The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine a plaintiff's RFC. *See Casino–Ortiz v. Astrue*, No. 06-civ-0155, 2007 WL 2745704, at *7 (S.D.N.Y. Sep. 21, 2007), *report and recommendation adopted by* No. 06-civ-155, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008). An RFC determination indicates the most an individual can do despite his or her impairments (*see* 20 C.F.R. § 404.1545(a)), and the RFC assessment includes consideration of an individual's exertional capabilities, including the ability to sit, stand, walk, lift, carry, push, and pull (*see* 20 C.F.R. § 404.1545(b)) and non-exertional limitations or restrictions, including manipulative or postural limitations, such as reaching handling, stooping, or crouching. *See Fernandez v. Astrue*, No. 11-civ-3896, 2013 WL 1291284, at *16 (E.D.N.Y. Mar. 28, 2013). "According to the SSA, sedentary work generally involves up to *two hours of standing or walking* and *six hours of sitting* in an eight-hour work day…and lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (internal citation omitted) (emphasis in original); *see also Carvey v. Astrue*, 380 F. App'x 50, 52 (2d Cir. 2010) ("in the Social Security context, a person must be able to lift ten pounds occasionally, sit for a total of six hours, and stand or walk for a total of two hours in an eight-hour workday to be capable of 'sedentary work'").

The ALJ's RFC determination that plaintiff had the residual functional capacity to perform sedentary work, which includes sitting for a total of six (6) hours in an eight (8) hour work day, is not supported by substantial evidence. In concluding that plaintiff could perform

sedentary work, the ALJ gave "considerable weight…[to] the portion of [Dr. Levy's] opinion limiting the claimant's ability to stand and walk to two hours and lift and carry ten pounds occasionally" (Tr. 26) but accorded "only substantial weight…[to] the portion of the opinion limiting the claimant's ability to sit to four hours" (*id.*) and found that "[d]espite this, the opinion of Dr. Levy outweigh[ed] the opinion of Dr. Urbanski [sic] that claimant cannot sit six hours, stand or walk two hours or lift or carry ten pounds…as this opinion [was] contrary to the bulk of the medical record until sometime after March 2005, long after the insured status lapsed." *Id.*

The Commissioner argues that the ALJ's conclusion that plaintiff could perform sedentary work was supported by substantial evidence (Def. Mem. at 19) despite the fact that the ALJ "did not adequately identify the evidence supporting his finding that Plaintiff ha[d] the residual functional capacity for the full range of sedentary work during the relevant period" (Def. Mem. at 20), but merely stated that "[b]ased on the medical record and how it progressed, the claimant's activities of daily living, the type of and response to treatment, the lack of significant adverse side effects from the treatment, and the opinions in the record, the undersigned concludes that the claimant can perform the full range of sedentary work through the date last insured." Tr. 26. However, the "substantial evidence" the Commissioner claims supports the ALJ's RFC determination does not relate to the plaintiff's ability to walk, sit, stand, carry, or lift. *See* Def. Mem. at 18-19, 22; Def. Reply, at 1-2. The Commissioner relies upon Dr. Tipimeni's June 2000 statement that plaintiff was "allowed only light administrative duties; no physical exertion" (Tr. 320) as support for the ALJ's conclusion that plaintiff could perform sedentary work, however this single statement does not opine upon the key abilities required to perform sedentary work such as an ability to lift ten (10) pounds occasionally, sit for a total of six (6) hours, and stand or walk for a total of two (2) hours in an eight (8) hour workday. *See Carvey*,

380 F. App'x at 52. Moreover, the ALJ's conclusion that "[t]he evidence through March 2005…[did] not support the limitations imposed on the claimant's ability to sit" (Tr. 26) because other "some tenderness in the cervical spine" (*id.* at 25) and "reduced mobility, tenderness and spasm in the lumbar spine" (*id.*), plaintiff had "otherwise normal clinical signs" through March 2002 and then from January 2002 through March 2005, the plaintiff's clinical status "remained largely unchanged" except for "some mild weakness in the left leg," (*id.*) was not only unsupported by substantial evidence,[3] but was also not supported by an expert medical opinion and "[i]n the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings." *Filocomo v. Chater*, 944 F.Supp. 165, 170 (E.D.N.Y. 1996)

None of plaintiff's treating physicians' opinions support the ALJ's RFC assessment, and the treating physicians' assessments are consistent with one another and supported by medical evidence. *See Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) ("The Commissioner, who has the burden on the issue, failed to introduce any medical evidence that [plaintiff] could hold a sedentary job. To the contrary, [plaintiff's] treating physicians concluded that [plaintiff] could not sit for long periods of time and therefore could not perform "sedentary work," as defined by 20 C.F.R. § 404.1567."). Dr. Stimler-Levy, who had treated plaintiff since July 23, 2002 (Tr. 696), opined that based upon plaintiff's history of a motor vehicle accident in 1997, his lumbar discectomy in 2000, and his subsequent treatment at her office, that plaintiff "has been unable to perform any continuous, substantial gainful activity since 2/14/00" and that "[t]here has been no appreciable change in [plaintiff's] condition since then, insofar as ability to work so…[plaintiff]

---

[3] The medical evidence in the record demonstrates that after plaintiff's surgery and before his insured status lapsed, plaintiff had an antalgic gait (*see, e.g.*, Tr. 319, 327, 369), tenderness, spasms and painful restriction in ranges of motion in the lumbar spine (*id.*), and positive straight leg raising. *Id.* at 317, 320, 321, 327.

remain[ed] unable to return to any gainful employment." *Id*. at 694. Dr. Stimler-Levy's physical capacity evaluation opined that plaintiff was not capable of sedentary work (*id*. at 697) and that plaintiff could sit for only one half-hour (1/2) or less at any one time and for only four (4) hours or less cumulatively in an eight (8) hour workday, and stand and/or walk for only one half-hour (1/2) or less at any one time and for only two (2) hours or less cumulatively in an eight (8) hour workday. *Id*. at 695. Dr. Urbanczyzk, plaintiff's primary care physician, completed a disability questionnaire on February 19, 2011, and opined that plaintiff could sit for less than six (6) hours per day and stand or walk for less than two (2) hours per day. *Id*. at 705.

The ALJ did not cite any medical opinion to dispute plaintiff's treating physicians' conclusions that plaintiff could not sit for more than six (6) hours per day but rather concluded, without, as the Commissioner concedes, "adequately identify[ing] the evidence supporting his finding" (Def. Mem. at 20), that plaintiff could "perform the full range of sedentary work through the date last insured." Tr. 26. In reaching this conclusion, despite the lack of any medical opinion in the record indicating that plaintiff could sit for more than six (6) hours in a day, and contrary to the opinions of plaintiff's treating physicians, the ALJ "ma[de] an RFC determination in the absence of supporting expert medical opinion…[and] improperly substituted [his] own lay opinion for the opinion of a physician." *Santillo v. Colvin*, No. 13-civ-8874, 2015 WL 1809101, at *9 (S.D.N.Y. Apr. 20, 2015) (citing *Hilsdorf*, 724 F. Supp. 2d at 347); *see also Meadors*, 370 F. at 183 ("ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [plaintiff's treating physician], who is more qualified and better suited to opine as to the test's medical significance"); *Balsamo*, 142 F.3d at 81 ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that

of a physician who [submitted an opinion to or] testified before him.") (internal quotation marks omitted).

The ALJ did not cite any medical evidence, and this court found none in the record, to suggest that plaintiff was capable of sitting for six (6) hours in the course of an eight (8) hour workday, as the ALJ concluded when he found that plaintiff could form the full range of sedentary work (Tr. 26) and thus, the ALJ's determination that plaintiff had the RFC to perform the full range of sedentary work is not supported by substantial evidence and must be reversed. *See Tricic v. Astrue*, No. 6:07-civ-997, 2010 WL 3338697, at *3-4 (N.D.N.Y. Aug. 24, 2010) (the ALJ's determination that plaintiff could stand/walk and sit for about six hours in an eight-hour workday was not supported by substantial evidence where two treating doctors opined that plaintiff should avoid prolonged sitting and/or standing, and no examining doctor provided a specific opinion about plaintiff's ability to sit or stand for particular periods of time); *Walker v. Astrue*, No. 08-civ-0828(A)(M), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010), *report and recommendation adopted*, No. 08-civ-828A, 2010 WL 2629821 (W.D.N.Y. June 28, 2010) ("[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the medical findings in the record merely diagnose [the] claimant's...impairments and do not relate these diagnoses to specific residual functional capabilities...[the Commissioner may not] make the connection himself.") (internal quotation marks omitted), *report and recommendation adopted,* No. 08-civ-828A, 2010 WL 2629821 (W.D.N.Y. June 28, 2010).

D.        Remand Solely for Calculation of Benefits

Where "the record provides 'persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' the court may reverse and remand solely for the calculation and payment of benefits." *Cherico v. Colvin*, No. 12-civ-5734, 2014 WL 3939036, at *31 (S.D.N.Y. Aug. 7, 2014) (citing *Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980)). Defendant contends that remand for further proceedings is necessary because the ALJ Decision, while "supported by substantial evidence" did contain "legal errors." Def. Mem., at 1. Plaintiff argues that reversal and remand solely for the calculation of benefits is proper here because the ALJ's conclusion that plaintiff could perform sedentary work was not supported by substantial evidence. Pl. Mem. at 7.

Here, the ALJ failed to properly apply the treating physician rule, failed to properly assess plaintiff's credibility, and determined, without substantial supporting evidence, that plaintiff had the RFC to perform sedentary work. While the Commissioner argues that a rehearing is proper so that the ALJ may consider additional evidence from plaintiff's treating sources and properly evaluate plaintiff's credibility, evaluation of this treating source evidence and a proper credibility analysis would not serve to support the ALJ's finding that plaintiff was capable of the full range of sedentary work, but rather proper application of the legal standards in evaluating the treating source opinions and plaintiff's credibility could only lead to one conclusion: it would further support the evidence in the existing record that plaintiff is incapable of performing the full range of sedentary work. *See Maline v. Astrue*, No. 08-civ-1712, 2010 WL 4258259, at *2 (E.D.N.Y. Oct. 21, 2010) ("Remand for the calculation of benefits is appropriate when the record provides persuasive proof of disability and the application of the correct legal standards 'could lead to only one conclusion.'") (citing *Johnson v. Bowen,* 817 F.2d

983, 986 (2d Cir. 1987)); *Barillaro v. Commissioner of Social Security*, 216 F. Supp. 2d 121, 131

(E.D.N.Y. 2002) (remanding solely for calculation of benefits because evidence did not support

finding that claimant was able to perform sedentary work but rather claimant was totally disabled

and "the omitted evidence [came] mostly from [a doctor] whose opinion [was] evident in the

existing record…[t]he remaining documents either [did] not address plaintiff's residual

functional capacity, or [did] not contradict the weight of the evidence").

Because the record provides persuasive proof of plaintiff's disability, proper application

of the legal standards would not contradict the weight of this evidence in the record, and "the

Commissioner failed to introduce evidence sufficient to sustain his burden of proving that

[plaintiff] could perform the exertional requirements of sedentary work," the proper course of

action is to reverse the ALJ Decision and "remand the matter to the Commissioner for a

calculation of disability benefits." *Curry*, 209 F.3d at 124 (2d Cir. 2000);[4] *see also Carroll v.*

*Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983) (where "reversal is based

solely on the [Commissioner's] failure to sustain his burden of adducing evidence of [plaintiff's]

capability of gainful employment and the [Commissioner's] findings that [plaintiff] can engage

in 'sedentary' work is not supported by substantial evidence, no purpose would be served by

---

[4]     Under the standard articulated in *Curry*, at the fifth step, the Commissioner must show that the claimant retains the residual functional capacity to perform a certain category of work, such as sedentary work, and that such work is available in the national economy.  While "SSA regulations have subsequently limited the step five burden on the Commissioner, removing the requirement that the Commissioner show residual functional capacity, *see* 20 C.F.R. § 404.1560(c)(2), and these regulations 'abrogated *Curry v. Apfel* at least in cases where the onset of disability was after the regulations were promulgated on August 26, 2003'" (*Lupo v. Comm'r of Soc. Sec.*, No. 07-civ-4660, 2011 WL 1316105, at *2 (E.D.N.Y. Apr. 4, 2011) (citing *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009))), because plaintiff's onset of disability was in 2000, prior to the promulgation of the new regulations, the case "must be decided under the *Curry* standard."  *Lupo*, 2011 WL 1316105, at *2; *see also Cataneo v. Astrue*, No. 11-civ-2671, 2013 WL 1122626, at *23 (E.D.N.Y. Mar. 17, 2013) ("district courts in this Circuit continue to apply the *Curry* standard to cases in which the claimant's alleged onset date precedes August 26, 2003.") (collecting cases).

remanding the case for a rehearing unless the Secretary could offer additional evidence"); *accord Balsamo*, 142 F.3d at 82; *Webster v. Colvin*, No. 13-civ-2580, 2014 WL 183936, at *15 (E.D.N.Y. Jan. 14, 2014) (remanding for calculation of benefits where Commissioner failed to observe the treating physician rule and improperly rejected plaintiff's testimony about her chronic disabling pain and there was "no basis to conclude that a more complete record might support the Commissioner's decision"); *Beckles v. Barnhart*, 340 F. Supp. 2d 285, 290-91 (E.D.N.Y. 2004) (remand solely for the calculation of benefits was proper where "the Commissioner failed to sustain her burden of proving that plaintiff could perform the exertional requirements of sedentary work"); *Irvine v. Sullivan*, No. 91-civ-500, 1992 WL 245581, at *6 (E.D.N.Y. Aug. 11, 1992) ("Because substantial evidence on the critical issue of RFC is lacking…the Court is constrained to remand the case for a calculation of benefits"); *Minor v. Astrue*, No. 11-civ-06556, 2012 WL 5948952, at *7 (W.D.N.Y. Nov. 28, 2012) (reversed and remanded solely for calculation of benefits where "the Commissioner's decision to deny the Plaintiff benefits was not supported by substantial evidence in the record and was marred by several legal errors" and where substantial evidence in the record demonstrated that plaintiff was disabled.).

## III.  CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is DENIED and plaintiff's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is GRANTED and this case is remanded solely for calculation of benefits.

**SO ORDERED**.                                       s/ Sandra J. Feuerstein
                                                       Sandra J. Feuerstein
                                                       United States District Judge

Dated: August 31, 2015
       Central Islip, New York